Filed 3/14/25

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| KOI NATION OF NORTHERN CALIFORNIA,<br><br>     Plaintiff and Appellant,<br><br>v.<br><br>CITY OF CLEARLAKE,<br><br>     Defendant and Respondent. | A169438, A169805<br><br>(Lake County Super. Ct. No. CV423786) |

These consolidated appeals concern a project to build a four-story hotel on a 2.8 acre parcel in the City of Clearlake and extend a road about 0.2 miles from its current endpoint westward to Old Highway 53. The City approved the project after adopting a mitigated negative declaration under the California Environmental Quality Act (Pub. Resources Code, § 21000 et seq., CEQA[1]). The Koi Nation of Northern California (Koi Nation), a California Native American tribe that is affiliated with the area of the project, filed a petition for writ of mandate challenging the approval based on allegations that the City failed to comply with CEQA, including provisions added to CEQA by Assembly Bill No. 52 (2013-2014 Reg. Session) (Assem. Bill No. 52). As stated by the Legislature, this bill was intended to "[e]stablish a new

---

[1] All further undesignated statutory references are to the Public Resources Code. We refer to the CEQA Guidelines (Cal. Code Regs., tit. 14, §§ 15000-15387) as the Guidelines.

category of resources in [CEQA] called 'tribal cultural resources' that considers the tribal cultural values in addition to the archaeological values when determining impacts and mitigation" (*id.* § 1(b)(2)); to "establish a meaningful consultation process between California Native American tribal governments and lead agencies . . . so that tribal cultural resources can be identified, and culturally appropriate mitigation and mitigation monitoring programs can be considered by the decisionmaking body of the lead agency" (*id.* § 1(b)(5)); and to "[e]stablish that a substantial adverse change to a tribal cultural resource has a significant effect on the environment." (*Id.* § 1(b)(9).)

Koi Nation now appeals from the trial court's denial of its petition, arguing that the City violated CEQA in three respects. First, the City failed to comply with CEQA's procedures for tribal consultation. Second, the City was required to prepare an environmental impact report, rather than a mitigated negative declaration, because the record includes substantial evidence of a fair argument that the project may have a significant impact on tribal cultural resources. Third, even if the City could proceed by means of a mitigated negative declaration rather than an environmental impact report, its mitigated negative declaration lacks information that CEQA requires.

This appeal requires us to apply provisions added to CEQA by Assem. Bill. No. 52. We conclude that the City failed to comply with CEQA's consultation requirements and the failure requires the City's approval of the project to be set aside. We need not address Koi Nation's other arguments. We will reverse the order and judgment denying Koi Nation's petition for writ of mandate and remand the matter to the superior court with instructions to issue a writ of mandate setting aside the City's mitigated negative declaration and related project approvals.

2

**FACTUAL AND PROCEDURAL BACKGROUND**

A.    *CEQA and the Consideration of Tribal Cultural Resources*

"CEQA is a comprehensive scheme designed to provide long-term protection to the environment." (*Mountain Lion Foundation v. Fish & Game Commission* (1997) 16 Cal.4th 105, 112.)  One of the "basic purposes" of CEQA is to "[i]nform governmental decision makers and the public about the potential, significant environmental effects of proposed activities." (Guidelines, § 15002, subd. (a)(1).)  Apart from exemptions that are not at issue here, CEQA applies to "discretionary projects proposed to be carried out or approved by public agencies."  (§ 21080, subd. (a).)

If CEQA applies to a project, the public agency prepares "an initial study to determine if the project may have a significant effect on the environment."  (Guidelines, § 15063, subd. (a); see *id.*, subd. (d) [describing contents of initial study].)  When an initial study identifies potentially significant effects on the environment, the agency may prepare a "mitigated negative declaration" (MND) if the project applicant makes or agrees to revisions to the project plans or proposal that "would avoid the effects or mitigate the effects to a point where clearly no significant effect on the environment would occur" and if "there is no substantial evidence, in light of the whole record before the lead agency, that the project, as revised, may have a significant effect on the environment."  (§ 21080, subd. (c)(2); see also § 21064 [defining MND], Guidelines, § 15070, subd. (b) [criteria for deciding to prepare MND], *Id.*, § 15071 [contents of MND].)  The agency must make the MND available for public review and comment (Guidelines, §§ 15072-15073), and the agency's decision-making body must consider the MND and any public comments and adopt the MND before approving the project.  (*Id.* § 15074, subd. (b).)

3

In 2014, CEQA was amended based on legislative findings that CEQA as it then existed did "not readily or directly include California Native American Tribes' knowledge and concerns," and that this deficiency had "resulted in significant environmental impacts to tribal cultural resources and sacred places, including cumulative impacts, to the detriment of California Native American Tribes and California's environment." (Assem. Bill No. 52, § 1(a)(3).) Accordingly, CEQA now provides that "[a] project with an effect that may cause a substantial adverse change in the significance of a tribal cultural resource is a project that may have a significant effect on the environment." (§ 21084.2.)

1.  *Tribal Cultural Resources*

CEQA defines two categories of "tribal cultural resources." (§ 21074, subd. (a).) Like the parties and amicus curiae, we refer to the categories as "mandatory" and "discretionary."

Mandatory tribal cultural resources are "Sites, features, places, cultural landscapes,[2] sacred places, and objects with a cultural value to a California Native American tribe that are either of the following: [¶] (A) Included or determined to be eligible for inclusion in the California Register of Historical Resources. [¶] (B) Included in a local register of historical resources as defined in [§ 5020.1, subd. (k)]." (§ 21074, subd. (a)(1).)

A discretionary tribal cultural resource is "[a] resource determined by the lead agency, in its discretion and supported by substantial evidence, to be significant pursuant to criteria set forth in [§ 5024.1, subd. (c)[3]]." (§ 21074,

---

[2] "A cultural landscape . . . is a tribal cultural resource to the extent that the landscape is geographically defined in terms of the size and scope of the landscape." (§ 21074, subd. (b).)

[3] A resource meets the criteria in section 5024.1, subdivision (c) if it: "Is associated with events that have made a significant contribution to the

4

subd. (a)(2).) In determining whether a resource is a discretionary tribal cultural resource, "the lead agency shall consider the significance of the resource to a California Native American tribe." (§ 21074, subd. (a)(2).)[4]

2.    *Consultation*

In Assem. Bill No. 52, the Legislature created a notice and consultation process to facilitate agencies' consideration of tribal "expertise concerning their tribal cultural resources." (§ 21080.3.1, subd. (a).) Before releasing an MND, an agency must give formal notification "to the designated contact of, or a tribal representative of" any "California Native American Tribe that is traditionally and culturally affiliated with the geographic area of the proposed project" if the tribe has submitted a written request for notice of such projects.[5] (*Id.*, subds. (b) & (d).) If a tribe "responds, in writing, within

---

broad patterns of California's history and cultural heritage[;] Is associated with the lives of persons important in our past[;] Embodies the distinctive characteristics of a type, period, region, or method of construction, or represents the work of an important creative individual, or possesses high artistic values[; or] Has yielded, or may be likely to yield, information important in prehistory or history."

[4] "Tribal cultural resources" are not the same as "cultural resources." This is reflected in the Environmental Checklist Form found in Appendix G to the Guidelines, which recognizes separate categories for "cultural resources" (which include historical resources and archaeological resources under Guidelines section 15064.5 and human remains) and "tribal cultural resources" as defined in section 21074. (See Guidelines, § 15063, subd. (f) [describing Appendix G as a sample form that could be used in initial study].) In certain circumstances, however, historical and archaeological resources may also be tribal cultural resources. (§ 21074, subd. (c).)

[5] "[F]ormal notification . . . shall be accomplished by means of at least one written notification that includes a brief description of the proposed project and its location, the lead agency contact information, and a notification that the California Native American tribe has 30 days to request consultation." (§ 21080.3.1, subd. (d).)

5

30 days of receipt of the formal notification, and requests the consultation" (*id.*, subd. (b)), the agency is required to begin consultation with the tribe within 30 days of receiving the tribe's request. (*Id.*, subd. (e).)

For purposes of Assem. Bill No. 52, "consultation" is defined by reference to section 65352.4 of the Government Code, which states that " 'consultation' means the meaningful and timely process of seeking, discussing and considering carefully the views of others, in a manner that is cognizant of all parties' cultural values and, where feasible, seeking agreement" and that "[c]onsultation between government agencies and Native American tribes shall be conducted in a way that is mutually respectful of each party's sovereignty." (See § 21080.3.1, subd. (b) [referring to Gov. Code, § 65352.4].)

CEQA does not prescribe topics for consultation, but provides that "[i]f the . . . tribe requests consultation regarding alternatives to the project, recommended mitigation measures, or significant effects, the consultation shall include those topics." (§ 21080.3.2, subd. (a).) The statute further provides that "[t]he consultation may include discussion concerning the type of environmental review necessary, the significance of tribal cultural resources, the significance of the project's impacts on the tribal cultural resources, and, if necessary, project alternatives or the appropriate measures for preservation or mitigation that the . . . tribe may recommend to the lead agency." (*Ibid.*) Thus consultation is not limited to an agency's consideration of proposals by a tribe: as part of the consultation either party "may propose mitigation measures . . . capable of avoiding or substantially lessening potential significant impacts to a tribal cultural resource." (*Ibid.*)

To protect the information provided by a tribe to an agency in the course of consultation, CEQA prohibits the disclosure of such information to

6

the public unless the tribe has given its prior consent. (§ 21082.3, subd. (c)(1).) Information provided by a tribe that is published by the agency "shall be published in a confidential appendix to the environmental document, unless the tribe that provided the information consents, in writing, to the disclosure of some or all of the information to the public." (*Ibid.*) The environmental document that is prepared for public review "shall include a general description of the information" provided by the tribe during the consultation process. (*Id.*, subd. (f); see also subd. (c)(4) [authorizing agencies to describe in an environmental document "in general terms" the information provided by a tribe "so as to inform the public of the basis of the . . . agency's decision without breaching the confidentiality required by this subdivision"].)

The consultation is "considered concluded" when the "parties agree to measures to mitigate or avoid a significant effect, if a significant effect exists, on a tribal cultural resource," or when "[a] party, acting in good faith and after reasonable effort, concludes that mutual agreement cannot be reached." (§ 21080.3.2, subd. (b).)

An agency may "certify an environmental impact report or adopt [an MND] for a project with a significant impact on an identified tribal cultural resource only if" (1) the consultation process occurred and concluded, or (2) the tribe requested consultation and failed to engage in the consultation process, or (3) the agency provided formal notification and the tribe failed to request consultation within 30 days. (§ 21082.3, subd. (d).)

B.    *The Project*

The "Airport Hotel and 18th Avenue Extension Project" (project) that is the subject of this case involves the construction of a four-story, 75-room hotel with a meeting hall and parking lot and the extension of 18th Avenue from

7

its current endpoint at State Route 53 westward to Old Highway 53. [6]  The project site, in the City of Clearlake, consists of a rectangular 2.8-acre parcel where the hotel would be built and a 3.47-acre strip of land south of the 2.8-acre parcel extending beyond the parcel boundaries in an east-west direction, which would be used for the 18th Avenue extension.  A driveway on the 2.8 acre parcel would connect the hotel to the 18th Avenue extension.

Most of the project site was disturbed by the construction of an airport extension in the 1970's, during which the land was bulldozed and graded, with most of the original landscape removed and redistributed as fill to form the base of an airstrip.  On the east side of the site there are deep cuts between 10 and 15 feet, and on the west side the fill is more than 40 feet deep in places and is capped by road base and pavement.

The former airstrip area, which includes the southern portion of the 2.8 acre parcel and part of the land to be used for the road extension, is currently used as a construction staging area for the storage of equipment and vehicles, stockpiles, and construction related materials, and contains piles of crushed concrete and pavement, sorted and unsorted gravel, and surplus soils from other sites that were dumped by the City and its contractors.  Some of the piles contain obsidian chunks and flakes that are associated with the soil that originated at other sites.  The land in the northern portion of the 2.8 acre parcel is relatively undisturbed, consisting primarily of wooded areas.  A portion of the land to be used for the 18th Avenue extension is currently a paved roadway, and a portion is undisturbed land that is primarily grassland with scattered trees and shrubs.

---

[6] The word "Airport" in the title of the project is apparently intended to reflect that the project is located north of the former site of Pearce Airport.

8

C.      *Coordination with Koi Nation*

The City retained Sub-Terra Heritage Resource Investigations to assist in studies and documentation associated with the project, including "(1) archival document review and archaeological, ethnographic, and historical background research; (2) Native American coordination; and, (3) an intensive archaeological survey."  The work was performed by Gregory G. White, Ph.D. As required by the City's own guidelines, White initiated Native American coordination on the project by contacting Dino Beltran, a member of the Koi Nation Tribal Council, in January 2022 to inform him of the project and request information about the cultural significance of the project area and any concerns regarding the proposed project.[7]  Beltran expressed concern to White that a Koi Nation ancestor had held property and resided in the area of the proposed project, and asked White to conduct research to determine the location of the residence with respect to the project site.

Dr. White determined that the ancestor's property and residence was 0.2 miles south of the project area.  He reported the results of his research to Beltran and the Koi Nation Tribal Council and also held a videoconference with several Koi Nation officers including Koi Nation Cultural Monitor Yolanda Tovar, where he presented information about the project.  White reported that at the videoconference, the "Koi Nation representatives advised that the [p]roject should proceed with caution" and asked him to communicate with the City planning team concerning the location and significance of the property and residence he had investigated.  White further reported that at a subsequent videoconference with City Manager Alan Flora

_____

[7] The City recognizes that this "coordination" did not constitute the "consultation" required by CEQA that occurs after an agency has provided formal notification to a tribe under section 21080.3.1.

9

on February 2, 2022, White presented his findings and the concerns expressed by Koi Nation, and Flora "confirmed that the City would proceed with all due caution and . . . committed to continue coordination with the Koi Nation Tribal Council on all work scheduled for the Airport Commercial Property."[8]

D.    *Tribal Consultation*

On February 10, 2022, not long after Dr. White held his videoconference with City Manager Flora, Dino Beltran (as noted, a member of the Koi Nation Tribal Council) emailed Flora requesting a meeting at which Beltran could introduce Flora to Robert Geary, whom Beltran identified as the Tribal Historic Preservation Officer for the Habematolel Pomo of Upper Lake (HPUL).[9]  Beltran stated that Koi Nation had "an Inter-governmental Agreement with the HPUL to assist us in addressing the needs to protect the ancestors in the Southeastern Clearlake region and would like you to get to know Robert and his expertise in working with municipalities in this regard."  A meeting was scheduled for the following Tuesday, February 15.  Koi Nation asserts, and the City does not dispute, that at the February 15 meeting Koi Nation identified Geary as its representative for Assem. Bill No. 52 consultation.

On February 16, the City sent Koi Nation formal notification under section 21080.3.1 of the opportunity to consult on the project.  The emailed notification, which was sent to Geary at an HPUL email address by City

---

[8] Subsequent dates are in 2022 unless otherwise stated.

[9] Koi Nation and HPUL are federally recognized Indian tribes.  Koi Nation explains in its opening brief on appeal that the two tribes "share[ ] heritage, culture, and historical experience of the Pomo people, from which [they] descend."  HPUL is not a party to this appeal.

10

Engineering Tech/Construction Manager Adeline Brown, stated it was being sent in response "to your request to be notified of projects in our jurisdiction that will be reviewed under CEQA." The notification consisted of a cover email from Brown to Geary with two attachments: a form entitled "Engineering Dept. Request for Review" which included a summary description of the project, and a "photo map" showing the location of the project. The Request for Review form includes a series of checkboxes that indicate the organization to whom the City's request is addressed. In this instance, the Request for Review form the City sent to Geary included several pre-printed options under the heading "Tribal Organizations," including one for "Koi Nation of NCA," which is the *only* box the City checked. The notification requested comments or a written request for consultation from Koi Nation of NCA within 30 days.

On February 23, Geary sent a letter to Brown on Habematolel Pomo Cultural Resources letterhead. The letter acknowledged receipt of the City's February 16 project notification letter (which, as noted above, had been sent to Geary in his capacity as a representative of Koi Nation) and continued: "We appreciate your effort to contact us and wish to respond. [¶] The Habematolel Pomo Cultural Resources Department has reviewed the project and concluded that it is within the aboriginal territories of the Habematolel Pomo of Upper Lake. Therefore, we have a cultural interest and authority in the proposed project area and would like to initiate a formal consultation with the lead agency. At your earliest convenience, please provide our Cultural Resources Department with a project timeline, detailed ground disturbance plan and the latest cultural resources study for this project." The letter requested that the City contact Geary to coordinate a date and time for the consultation meeting. The letter was sent to the City as an attachment to

11

an email to Brown that was copied to Koi Nation Cultural Monitor Yolanda Tovar and the Koi Nation Tribal Council, but neither the email nor the attached letter mentioned Koi Nation.

Consultation on the project occurred on March 9. The MND that was eventually prepared for the project states that the consultation was requested by, and conducted with, HPUL.

Geary wrote a letter to Adeline Brown (the member of City staff who had sent the Request for Review form) on March 9, again on Habematolel Pomo Cultural Resources letterhead, acknowledging the consultation that had occurred on that date and stating the following: "The Habematolel Pomo Cultural Resources Department has reviewed the project with your agency and concluded that it is within the aboriginal territories of the Koi Nation and Habematolel Pomo of Upper Lake. Therefore, we have a cultural interest and authority in the proposed project area. [¶] Based on the information provided at the above scheduled consultation, *the Tribe has concerns that the project could impact known cultural resources. We request including cultural monitors during development and all ground disturbance activities.* Additionally, we request that you incorporate Habematolel Pomo of Upper Lake's Treatment Protocol into the mitigation measures for this project and recommend cultural sensitivity training for any pre-project personnel on the first day of construction activities." (Italics added.) The letter stated that Geary could be contacted "*[t]o setup a monitoring agreement.*" (Italics added.) Like Geary's February 23 letter, the March 9 letter was sent as an attachment to an email that did not mention Koi Nation but was copied to Koi Nation Cultural Monitor Yolanda Tovar and the Koi Nation Tribal Council.

12

On March 23, Geary followed up once again with the City by sending an email to Adeline Brown to which he attached the "Intergovernmental Agreement between Habematolel and Koi," which apparently he had previously promised to provide. In his email, Geary stated, *"We are still waiting for monitor agreements for the project we consulted on. Please[ ] keep me updated."* (Italics added.) The record also shows that, separate from the consultation, the City arranged with Geary for tribal monitoring of work in March 2022 that involved a geotechnical consultant for the City doing "some boring" on the part of the project site designated for the 18th Avenue extension, and the City paid HPUL for the monitoring in May 2022. Apart from this, there was apparently no further communication about the project between the City and Geary or anyone else affiliated with Koi Nation or HPUL, until the City circulated the Notice of Intent to Adopt a Mitigated Negative Declaration for the project in October 2022.

E.     *Report on Cultural Resource Investigation*

In August 2022, Dr. White sent the City his report on his cultural resource investigation of the project site.

As detailed in the report, White conducted extensive document review and archaeological, ethnographic, and historical background research. Among other things, White reviewed multiple primary sources of information on traditional Pomo geography and land use, and found "[n]o specific evidence was identified relating to traditional place names or land use in the [p]roject footprint."

The report also describes an archaeological field survey of the project footprint, including the 2.8-acre parcel and the area of the road extension, that Dr. White conducted in July 2022. The report states that the bulk of the project site was "occupied by the highly disturbed footprint of the north

13

extension" of the former Pearce Airport. In the survey, "open dirt areas were closely inspected for signs of cultural material and features," and "potentially culturally-modified items were dislodged using a trowel or geopick and examined for evidence of human agency." Soils were scraped at intervals and a small prove was excavated. In the "small areas of intact landscape" at the margins of the project site, trowel and shovel probes were dug. White reported that "[n]o cultural resources—no prehistoric or historical resources, artifacts or features—were identified by the field survey."

In addition, the report describes Dr. White's "coordination" with Koi Nation and follow-up with City Manager Flora in January and February, and includes documentation of the research White conducted and presented to Koi Nation representatives concerning a property and a residence outside the project footprint, as discussed above.

Apparently recognizing the possibility that cultural resources, including human remains, might be uncovered below the surface of the project site during construction, Dr. White recommended three "measures for potential mitigation": (1) stopping work within 100 feet of any subsurface archaeological remains that are uncovered, with the project owner to use a "qualified cultural resources consultant . . . to identify and investigate" the remains and define their physical extent and nature; (2) formal evaluation of remains to determine whether the resources are eligible for the California Register of Historical Resources, and, if necessary, taking action to mitigate any project impacts; and (3) "[i]f human remains are encountered, no further disturbance shall occur within 100 feet of the vicinity of the find(s) until [the coroner] has made the necessary findings as to origin," with remains to be left in place and undisturbed pending a final decision as to treatment and disposition. If the coroner determines that human remains are Native

14

American, the Native American Heritage Commission is to be contacted to identify the most likely descendant, and the landowner is to consult with the descendant, who is to recommend treatment of the remains.[10]

The report concluded that "the [p]roject will have no cultural resource effects."

F.    *Public Review and Hearings*

On October 26, the City issued a Notice of Intent to Adopt a Mitigated Negative Declaration for the project.  The MND states that with the incorporation of mitigation measures, any impact on tribal cultural resources was less than significant.

The MND recognizes Koi Nation's ancestral ties to the project area and summarizes Dr. White's coordination with Koi Nation, which we described above.  The MND continues, "In compliance with AB 52 (Public Resources Code Section 21080.3.1), notification of the project was sent to local tribes[11] by the City of Clearlake.  The Habem[a]to[l]el tribe requested consultation which occurred in March 2022."

The MND states that although no tribal cultural resources had been discovered at the project site, "unknown tribal cultural resources have the

---

[10] The report states that the most likely descendant of any human remains encountered on the project site "will likely be the Koi Nation based upon the Tribe's "ancestral ties to the area and previous designation as [the most likely descendant] on projects in the geographic vicinity."

[11] As we have described, the City's records show that the February 16 formal notification was sent to only one tribe, Koi Nation.  The reference to "local tribes," plural, may reflect the fact that a few weeks later a second formal notification about the project, concerning a request for a conditional use permit to allow the sale and consumption of alcoholic beverages and special events, was sent to two tribes, Koi Nation and Elem Indian Colony. The City represents, and no one disputes, that the City received no response to the second notification, which is not at issue in this appeal.

15

potential to be uncovered during ground-disturbing activities," and therefore the project "could result in a substantial adverse change in the significance of a tribal cultural resource."[12]  The mitigation measures incorporated in the MND to reduce any impact of the project to "less than significant" levels include not only the three measures that had been recommended in Dr. White's cultural resource investigation, but also a measure requiring cultural sensitivity training for contractors involved in ground disturbing activities, to be conducted on or before the first day of construction.

The issuance of the Notice of Intent opened a 30-day period for public comment.  The City received no comments from Koi Nation.

On December 13, the City Planning Commission held a noticed public hearing on the project and MND.  No comments were made by the public at the meeting.  During the meeting, a commission member stated, "I noticed there was something about AB-52 in there, and I was just wondering if a consultation had happened."  The response from City staff did not address or even mention the CEQA consultation requirement or the March 9 tribal consultation meeting.  The staff member said only, "So when the initial study was sent out for the 30-day review [in October 2022], it was sent to all agencies, and we didn't receive any comments or concerns from the local tribal organizations."

The Planning Commission approved the MND and the project.  The conditional use permit approved by the Planning Commission for the project included the four mitigation measures described above, as well as the

---

[12] The MND also states that even though the project site had been the subject of a records search and archaeological field study and had been bulldozed and graded, the Koi Nation's ancestral ties to the area meant that "a remote possibility exists that unknown archaeological resources, including human remains, could be uncovered during ground-disturbing activities."

16

additional condition that "[t]he developer/landowner shall relinquish ownership of all sacred items, burial goods and all archaeological artifacts that are found on the project area to the most likely [descendant] for proper treatment and disposition."

On December 22, Koi Nation appealed the Planning Commission's decision to the City Council. In advance of the appeal hearing, Koi Nation submitted a number of documents to the City Council, including several that Koi Nation deemed confidential.[13]

At the February 2, 2023 appeal hearing, the City acknowledged receiving Koi Nation's appeal and subsequent submission of documents, and reported they had been distributed to the City Council members. The City Council heard a presentation from City Manager Flora, after which Koi Nation tribal chair Darin Beltran introduced himself and then ceded his time to Robert Geary, who Beltran identified as Koi Nation's Tribal Historic Preservation Officer, and two attorneys representing Koi Nation. Geary explained that a confidential map that had been provided to the City Council showed that tribal cultural resources are "close in proximity" to the project site, the closest being a little more than 100 feet from the project boundary. He stated that when resources are close to project sites, the concern is that there might be things underground that have not been found, and that at the March 9, 2022 consultation meeting with the City (the meeting we described above) he had proposed having a tribal monitor on-site because there would not be a full-time archaeologist on site. He said, "[A]rchaeological monitoring

---

[13] CEQA provides that tribes may submit confidential information to a lead agency about tribal cultural resources outside formal consultation. (See § 21080.3.2, subd. (c)(1) [tribe may submit information outside formal consultation]; § 21082.3, subd. (c) [protection of confidential information submitted by a tribe during the CEQA process].)

17

. . . and tribal monitoring are two different things. Archaeological resources and tribal . . . resources are two different things. And so that's why I think it's important [to have] the combination, the collaboration . . . of both." He also stated that "in the tract of where the project is going to be located, there are two land tracts" where blue acorns had been gathered in the past; that acorns were now gathered at a location "across the highway"; and that there had not been consideration of those practices. He said that at the consultation meeting he had provided a treatment protocol to be used if resources were found, and a monitoring agreement, and was told that the adoption of those measures were contingent on the approval of City Manager Flora, but he never heard anything further.[14]

Koi Nation attorneys Bill Chisum and Holly Roberson also addressed the City Council. Roberson stated that she had brought with her draft mitigation measures, which, if adopted by the City Council as conditions of project approval, would "make the City's determination that mitigation . . . to the level 'less than significant' impact is adequate" and would allow the tribe "to stand down." She urged the City Council to *finish consultation and move forward*," and stated that Koi Nation was not trying to stop development in

---

[14] Later in the meeting, City Manager Flora was asked whether any of the requested mitigation measures had been considered. He responded that they had, and that based on the lack of evidence of tribal cultural resources at the project site, City staff did not "see the need to include [monitoring] as a mitigation measure or adoption of those protocols." He also stated, "We did add cultural sensitivity training as a . . . mitigation measure. I think that makes sense. Even in areas where we have no evidence of tribal cultural resources in a project, we do know that it's a sensitive area that has a lot of resources in that region particularly over—you know, as you get closer to the lake. And so that's why that was added."

Clearlake, but "just want to make sure that the law is followed." (Italics added.)

The City Council then heard public comment, including from Robert Morgan, who identified himself as a member of Koi Nation. Morgan expressed concern that the project would disturb artifacts or the remains of ancestors who had been buried, and stated, "[t]here's already been a lot of remains that have been disturbed" and that some artifacts had been destroyed or "collected and hung up on walls within this county."

Public comment was followed by remarks from the City's CEQA attorney Andrew Skanchy and a rebuttal from Koi Nation's attorney Roberson. The City Council then began its deliberations, during which Geary, Roberson, Flora, and Skanchy made further comments in response to questions and comments by City Council members.

The City Council denied Koi Nation's appeal, but modified the first mitigation measure to require that if subsurface remains are uncovered the project owner "use a qualified cultural resources consultant *and coordinate with a tribal resources expert from Koi Nation* to identify and investigate" the remains. (Italicizing the language added by the City Council.) In approving the MND and the project, the City Council determined that there was no evidence of tribal cultural resources on the project site, and that with the proposed mitigation measures the project would have a less-than-significant impact on the significance of any unknown tribal cultural resources.

G.    *Proceedings in the Trial Court*

In March 2023, Koi Nation filed a verified petition for writ of mandate in the trial court, challenging the approval of the project. The trial court issued a stay prohibiting ground-disturbing activities until its ruling on the petition.

19

In October 2023, the trial court heard oral argument from Koi Nation and the City on the merits of the petition,[15] and at a hearing the next month the court pronounced its statement of decision denying Koi Nation's petition and dissolving the stay that had been in place. In denying the petition, the trial court stated that it had reviewed and considered the oral argument, as well as the parties' briefs, briefing from the Attorney General on CEQA's tribal consultation provisions, and portions of the administrative record presented in the parties' joint appendix and cited in their briefs. The court concluded that the City had not violated CEQA's consultation requirements because nothing in the record constituted a written request from Koi Nation to invoke the right to consultation on the project under section 21080.3.1, subdivision (b), and that in the absence of a request for consultation, Koi Nation could not challenge the consultation that did occur. The trial court also rejected Koi Nation's claims that the City violated CEQA by failing to fully investigate, review, and consider the project's impacts on tribal cultural resources, including ignoring substantial evidence of tribal cultural resources; by neglecting to analyze and adopt culturally appropriate and feasible mitigation measures; and by failing to consider cumulative impacts on tribal cultural resources in connection with other City projects.

The trial court subsequently denied Koi Nation's application for a further stay pending appeal.

Koi Nation timely appealed from the judgment entered after the November 2023 hearing and the order denying its application for stay.[16] We

---

[15] The alleged real parties in interest, Matt Patel and MLI Associates, LLC, did not appear in the trial court. Their defaults were entered a few days after the October 2023 hearing.

[16] Amicus curiae briefs in support of Koi Nation were filed in this court by the Attorney General, who also filed an amicus curiae brief in support of

20

granted Koi Nation's petition for writ of supersedeas and stayed the proceedings, including any construction of the project, pending further consideration and disposition of the consolidated appeals. Absent any other orders, the stay will dissolve upon issuance of the remittitur in these appeals.

## DISCUSSION

A.    *Standard of Review*

Our review of the City's compliance with CEQA "extend[s] only to whether there was a prejudicial abuse of discretion. Abuse of discretion is established if the agency has not proceeded in a manner required by law or if the determination or decision is not supported by substantial evidence." (§ 21168.5.) "Judicial review of these two types of error differs significantly: while we determine de novo whether the agency has employed the correct procedures, 'scrupulously enforc[ing] all legislatively mandated CEQA requirements' [citation], we accord greater deference to the agency's substantive factual conclusions." (*Vineyard Area Citizens for Responsible Growth, Inc. v. City of Rancho Cordova* (2007) 40 Cal.4th 412, 435.) Our "review of the administrative record for legal error and substantial evidence . . . is the same as the trial court's: [we] review[ ] the agency's action, not the trial court's decision." (*Id.* at p. 427.)

As for prejudice, our Supreme Court has instructed that if " 'an agency fails to proceed [as CEQA requires], harmless error analysis is inapplicable. The failure to comply with the law subverts the purposes of CEQA if it omits material necessary to informed decisionmaking and informed public participation. Case law is clear that, in such cases, the error is prejudicial.' "

Koi Nation in the trial court, and by HPUL. An amicus curiae brief in support of the City was filed by League of California Cities and California State Association of Counties.

21

(*Sierra Club v. County of Fresno* (2018) 6 Cal.5th 502, 515 (*Sierra Club*); see also § 21005, subd. (a) [noncompliance with CEQA "may constitute a prejudicial abuse of discretion . . . regardless of whether a different outcome would have resulted if the public agency had complied with those provisions"].)  In other words, if failure to comply with the law results in an environmental document that omits information, and the omission "precludes informed decisionmaking and informed public participation," the goals of CEQA have been thwarted and there has been a prejudicial abuse of discretion.  (See *Kings County Farm Bureau v. City of Hanford* (1990) 221 Cal.App.3d 692, 712 [discussing prejudice in the context of an environmental impact report].)

When our review requires us to interpret a statute, "[o]ur fundamental task . . . is to determine the Legislature's intent so as to effectuate the law's purpose.  We first examine the statutory language, giving it a plain and commonsense meaning.  We do not examine that language in isolation, but in the context of the statutory framework as a whole in order to determine its scope and purpose and to harmonize the various parts of the enactment.  If the language is clear, courts must generally follow its plain meaning unless a literal interpretation would result in absurd consequences the Legislature did not intend.  If the statutory language permits more than one reasonable interpretation, courts may consider other aids, such as the statute's purpose, legislative history, and public policy."  (*Coalition of Concerned Communities, Inc. v. City of Los Angeles* (2004) 34 Cal.4th 733, 737.)

B.     *CEQA's Consultation Requirement*

Koi Nation argues that although it requested consultation with the City on the project in writing, as it was required to do by statute, "[t]he City did not lawfully conduct or conclude consultation with" Koi Nation.  Koi

Nation's position is that the City's failure to consult meant that the City lacked information necessary to understand the environmental impacts of the project and avoid or mitigate those impacts. The City argues that Koi Nation did not comply with the statutory requirements for triggering consultation, but that the City nevertheless fully satisfied the consultation requirements. Koi Nation has the stronger argument.

1. *Koi Nation's Request for Consultation*

Section 21080.3.1, subdivision (b), states that after an agency sends formal notification of a proposed project to a tribe, consultation with the tribe is required if "the . . . tribe responds, in writing, within 30 days of receipt of the formal notification, and requests the consultation." Thus, the statute requires only that a tribe's response be in writing, be timely, and request consultation.

There is no dispute that the City sent formal notification of the project to Koi Nation by sending notice on February 16, 2022 to Geary, whom Koi Nation had designated as its representative. Koi Nation points to Geary's February 23 letter to support its assertion that Geary timely responded to the City requesting consultation.

The record supports Koi Nation's assertion. The February 23 letter from Geary states that it is a response to the February 16 notification of the project that was sent by the City, and it requests consultation with the City on the project. The only tribe to whom the City gave formal notification of the project on February 16 was Koi Nation, by means of an email to Geary, the HPUL Tribal Historic Preservation Officer identified by Koi Nation as its representative. Thus, Koi Nation responded, in writing, within 30 days of receipt of formal notification and requested consultation. This is all that the statute requires. We conclude that the letter meets the requirements of

23

section 21080.3.1, subdivision (b) for a written request to consult by Koi Nation in response to the City's formal notification.

The City argues unpersuasively that no reasonable person would agree that the February 23 letter constituted a written request by Koi Nation, and that it should not be required to keep track of intergovernmental agreements or guess as to "who a representative is speaking for when receiving a consultation request." The letter may be less than ideally clear, but in context it suffices. The administrative record shows that the City directed the February 16 notification to only one tribe, *Koi Nation*, addressed to Robert Geary. That is who responded. The City had been informed that Geary was serving as Koi Nation's representative for Assem. Bill No. 52 consultation and that pursuant to an agreement, HPUL would be "assist[ing]" Koi Nation in protecting tribal cultural resources. In these circumstances, there was no need for the City to "guess" about Geary's response to the City's February 16 notification of the project.[17]

Because we conclude that Koi Nation met the statutory requirements for requesting consultation, we do not reach the argument, advanced for the

_____

[17] Even though the February 23 letter states it is a response to the City's February 16 notification and the City's records show that the notification was directed to Koi Nation, not HPUL, the MND shows that the City understood Geary's letter to be a request for consultation from HPUL. The City's understanding may have been informed by the fact that by February 23, Geary had been designated as the Assem. Bill No. 52 contact for HPUL, in addition to Koi Nation. As it happens, the record does not include any Request for Review form showing that the City ever sent formal notification of the project to HPUL. But in any event, the issue before us is not what the City understood; the issue is whether Koi Nation complied with the statutory requirement to "respond[ ]" to the formal notification "in writing . . . and request[ ] the consultation" (§ 21080.3.1, subd. (b)), which it did.

first time on appeal by Koi Nation and the Attorney General's amicus curiae brief to this court, that courts should apply the substantial compliance doctrine in determining whether the requirements for such a request have been met.

Having determined that Koi Nation requested consultation under section 21080.3.1, subdivision (b), we now turn to the question whether the consultation that occurred met the requirements established by CEQA and Government Code section 65352.4.

2. *The Consultation*

Koi Nation argues that the City did not lawfully conduct or conclude the consultation required by sections 21080.3.1 and 21080.3.2. Koi Nation asserts that the City met with Geary to discuss the project only once, never responded to the information Geary provided or the mitigation measures he proposed or otherwise engaged with Koi Nation about identifying tribal cultural resources or appropriate mitigation measures, and made no effort to reach mutual agreement on those issues.

The City disagrees. It counters that Geary's March 9 follow-up letter, sent after the consultation meeting, did not request any further consultation or suggest that Koi Nation had any additional information to provide or matters to discuss, but instead requested that certain mitigation measures be added to the project because of "concerns that the project could impact known cultural resources." The City argues that in the wake of the March 9 meeting and Geary's letter, consultation was properly concluded under both of the conditions set forth in section 21080.3.2, subdivision (b). The City argues it was not obliged to "agree to measures to mitigate or avoid a significant effect" on a tribal cultural resource because there was no evidence that "a significant effect exists" (§ 21080.3.2, subd. (b)(1)), and that in any event the City,

25

"acting in good faith," concluded that the mitigation measures Geary requested were unwarranted and that mutual agreement could not be reached.  (*Id.* subd. (b)(2).)

As we discuss, the administrative record is sparse, and the little that there is does not permit us to conclude that the consultation met the statutory requirement of a "process of seeking, discussing and considering carefully the views of others" and "where feasible, seeking agreement."  (Gov. Code, § 65352.4.)  Nor does the record support the City's claim that consultation could "permissibly cease" under section 21080.3.2, subdivision (b).

a.    *The Evidence in the Administrative Record*

CEQA requires that an environmental document "include a general description of the information" obtained during consultation (§ 21082.3, subd. (f)), but neither the MND nor any confidential appendix includes any information about the consultation beyond the fact that it "occurred in March 2022."  The administrative record shows that Geary provided the City with a treatment protocol and requested specific mitigation measures in the course of consultation, but the MND itself does not inform decisionmakers or the public that mitigation measures were requested, or what those measures were, or whether the City decided to implement them.

Further, the MND itself says nothing about the City's basis for determining that consultation had concluded or when the City made that determination.  The rest of the administrative record provides little additional information on this point.  There are no notes or memoranda in which City staff describe the March 9 meeting, or discuss the requests made by Geary or the reasons for deciding whether to agree to those requests.

26

According to undisputed testimony from Geary at the City Council appeal hearing, at the March 9 meeting, City staff told Geary that the adoption of the measures he requested depended on approval by the City Manager, but the City never informed Geary whether such approval was forthcoming or the reasons it was not, even after Geary followed up with an email on March 23.  Geary never received a letter or statement from the City that consultation was closed, and he believed that the consultation was still ongoing after the March 9 meeting, until he received a copy of the Notice of Intent, which the City issued in October 2022.

The administrative record is opaque with respect to the City's perspective on the consultation.  Apart from the apparently erroneous statement in the MND that consultation with HPUL occurred in March, the only information about the City's conduct of the consultation is City Manager Flora's response to a question from the Vice Mayor at the City Council appeal hearing as to whether the City had considered the requests for mitigation measures that Geary had made.  Flora answered that the measures had been considered and, except for cultural sensitivity training, rejected.  Flora stated that the City did not see any need for tribal monitors or a treatment protocol because there was "no evidence of tribal cultural resources" at the project site.

In short, the record shows that a consultation meeting was held on March 9 at which Geary presented information to City staff and requested the implementation of mitigation measures based on concerns that the project could impact tribal cultural resources.  The City took the requests under submission, but did not engage in any further discussion with Koi Nation about the requests, even after Geary sent follow-up communication.  Eventually, at some time not disclosed in the record, the City decided to

27

grant one of the requests and deny the others, but the City never informed Koi Nation of the reasons for its decisions.

        b.    *Requirements of Government Code section 65352.4*

"Meaningful" discussion is the hallmark of CEQA's tribal consultation requirement. As we have described above, consultation means the "*meaningful* and timely process of seeking, discussing and considering carefully the views of others, in a manner that is cognizant of all parties' cultural values and, where feasible, seeking agreement." (Gov. Code, § 65352.4, italics added.) The consultation here was perfunctory at best. As far as the record reflects, there was no discussion between the City and Koi Nation of the reasons for the City's decision to reject two of the mitigation measures that Koi Nation had requested (that is, the retention of on-site tribal cultural monitors during development and all ground disturbance activities and the adoption of a specific protocol for handling human remains and cultural resources). The City did not even inform Geary directly of its decision: he learned of it from the MND.

The City's conclusion that there was no evidence of tribal cultural resources at the project site, which underlay its determination that the measures requested by Geary were unnecessary, was apparently based on Dr. White's report, which was not completed until August 2022. The City reached that conclusion without discussing White's report with Geary, although Geary had expressly requested a copy of the cultural resources study conducted for the project. Moreover, although White had conducted ethnographic research in preparing his report, his report addressed "cultural resources," and he explained to the City in September 2022 that the "evaluations and recommendations" in his report were "based on the archaeology side of the balance" and that a tribe could "*make different*

28

*recommendations regarding tribal cultural resources*." (Italics added.) Yet even with this cautionary statement from White, it appears that in determining whether the project would impact tribal cultural resources, the City failed to consider the value and significance of resources to Koi Nation. (§ 21074, subd. (a).) The tribal consultation requirement is intended to facilitate precisely such consideration. (See § 21080.3.2, subd. (a) [topics for consultation include "the significance of tribal cultural resources"].)

Further, "consultation" requires "seeking agreement" where agreement is "feasible." (Gov. Code, § 65352.4.) Nothing in the record shows that agreement between the City and Koi Nation was infeasible: there is no evidence that either party had adopted an entrenched position or that the parties had reached an impasse. But there is also no evidence that the City sought agreement, as it was required to do. (*Ibid.*) As far as we can tell from the record, the City simply determined at some point after Dr. White's report was completed in August 2022 that the mitigation measures that Geary had proposed were unnecessary, but the City did not inform Koi Nation of its decision or the basis for that decision. In the absence of any discussion about the City's reasoning or conclusions, there was no real opportunity for Koi Nation and the City to seek mutual agreement as the statute contemplates. (See § 21080.3.2, subd. (b)(2) [parties are to act "in good faith" and make "reasonable effort" to reach a "mutual agreement"].)

c. *Requirements for Deeming Consultation Concluded*

In the absence of evidence that any meaningful consultation took place, we need not consider whether consultation was appropriately "concluded" under section 21080.3.2, subdivision (b). We note, however, that the City's arguments that it properly considered consultation concluded are unpersuasive. The City's contention that there was no evidence of a

29

significant effect on a tribal cultural resource and therefore consultation was properly concluded under subdivision (b)(1) of section 21080.3.2 rests on Dr. White's report. As we have explained, White's report did not obviate the need for the City to consider the significance of resources to Koi Nation in identifying tribal cultural resources. In the absence of the City taking the necessary steps to identify tribal cultural resources, its determination that the project will have no significant effect on tribal cultural resources carries no weight. And we see no evidence in the administrative record that the City made the "reasonable effort" to reach mutual agreement with Koi Nation that is required for consultation to be deemed concluded under subdivision (b)(2) of section 21080.3.2.

We conclude that the City failed to comply with CEQA's consultation requirement, and thus that the City did not proceed in the manner required by law, which is an abuse of discretion. (§ 21168.5.) We turn to the question whether that abuse of discretion was prejudicial.

C.    *Prejudice*

The City argues that any failure to comply with CEQA's provisions for consultation was not prejudicial because Koi Nation presented its evidence by means of the "coordination" in January and February 2022, when an ancestor's property was located, and by submitting documents and testimony at the City Council appeal hearing. The City contends that this is not a case where there was any omission of "material necessary to informed decisionmaking and informed public participation" that would result in prejudicial error. (*Sierra Club, supra*, 6 Cal.5th at p. 515.)

The City's approach suggests that the consultation provisions added to CEQA by Assem. Bill No. 52 are optional, and that an agency need not comply with those provisions as long as a tribe that has requested

30

consultation has presented information to the agency by some other means. This is not the law. CEQA's recognition that tribes may submit information to an agency outside the consultation process (§ 21080.3.2., subd. (c)(1)) does not eliminate the need for consultation, conducted in the manner set forth in sections 21080.3.1 and 21080.3.2, or the need for the agency to show whether or how the consultation affected the agency's decision. (See § 21082.3, subds. (c)(4) [recognizing the need to "inform the public of the basis of the . . . agency's decision"] & (f) [requiring "a general description of the information" provided during consultation to be included in the environmental document made available for public review].)

The City's failure to comply with the consultation requirement means that information the Legislature has deemed necessary for informed decision-making and public participation was not presented to the decision makers or included in the documents available to the public. This constitutes a prejudicial abuse of discretion, and therefore the City's approval of the MND and the project cannot stand.

Accordingly, we will reverse the trial court's order and judgment. We do not reach the other arguments that Koi Nation raises on appeal, including whether the record includes substantial evidence of a fair argument that the project may have a significant impact on tribal cultural resources and whether the MND adequately addresses cumulative impacts on tribal cultural resources.

Koi Nation asks us also to order the City to prepare an EIR on the project. We decline this request as premature. If the City goes forward with the project, it must comply with CEQA's requirements, including the requirements for formal notification to those California Native American Tribes affiliated with the area that have requested notification and

consultation with tribes that request consultation in response to notification. (§ 21080.3.1, subd. (b).) Any consultation must be "meaningful" and "conducted in a way that is mutually respectful of each party's sovereignty" (Gov. Code, § 65352.4) and should be documented in sufficient detail to permit both informed public participation and informed decisionmaking. (*Sierra Club, supra*, 6 Cal.5th at p. 515.)

## DISPOSITION

We reverse the order and judgment denying Koi Nation's petition for writ of mandate and remand the matter to the superior court with instructions to issue a writ of mandate setting aside the City's MND and related project approvals. Koi Nation shall recover its costs on appeal.

_____
Miller, J.

WE CONCUR:

_____
Richman, Acting P. J.

_____
Desautels, J.

Court: Lake County Superior Court

Trial Judge: Hon. Michael S. Lunas

Kronick, Moskovitz, Tiedemann & Girard, William T. Chisum, Holly A. Roberson and Curtis A. Vandermolen for Plaintiff and Appellant.

Rob Bonta, Attorney General, Jeremy M. Brown, Assistant Attorney General, Christie Vosburg, Monica Heger and Yuting Yvonne Chi, Deputy Attorneys General, for the California Attorney General as Amicus Curiae on behalf of Plaintiff and Appellant.

Actium, Mike Gotto and Allan Johnson for Habematolel Pomo of Upper Lake as Amicus Curiae on behalf of Plaintiff and Appellant.

Downey Brand, Andrew M. Skanchy and Dustin D. Peterson for Defendant and Respondent.

Best Best & Krieger, Sarah E. Owsowitz and Megan Kilmer for League of California Cities and California State Association of Counties as Amici Curiae on behalf of Defendant and Respondent.

A169438, A169805, *Koi Nation of Northern California v. City of Clearlake*